IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

CHRISTINE DWYER,                    )
                                   )
            Plaintiff,              )
v.                                  )        Case No. CIV-18-328-KEW
                                   )
CD'S MACHINE, INC.,                 )
An Oklahoma corporation, and        )
CALVIN SMITH,                       )
                                   )
            Defendants.             )

## OPINION AND ORDER

This is an action for collection of a debt allegedly based upon oral loan agreements between Plaintiff and Defendant CD's Machine, Inc. ("CDS") 1 , for fraudulent misrepresentations Defendant Calvin Smith ("Smith") made to Plaintiff to induce her into making the loans, and for the unjust enrichment of CDS as a result of the loans.

Beginning on October 22, 2019, this Court conducted a Non-Jury Trial with regard to the outstanding issues in dispute in this action.  After the presentation of evidence, the parties were afforded the opportunity to file proposed findings of fact and conclusions of law and written closing arguments, which were submitted in a timely manner in January of 2020.  This Court has

---

1 Throughout the litigation and the dealings of the parties, CDS is interchangeably referred to as "CD's Machine, Inc." and "CDS Machine, Inc." For purposes of reference, the Court will utilize the abbreviation to refer to this entity in this Opinion and Order as "CDS".

considered all of the evidence presented by way of live testimony, depositions, exhibits and stipulations as well as the parties' proposed findings and conclusions in the formulation of this Order. After said consideration, this Court hereby enters the following findings of fact and conclusions of law in conformity with Fed. R. Civ. P. 52:

## FINDINGS OF FACT

### Facts Relevant to All Claims

1.   CDS is an Oklahoma corporation formed by Smith on March 12, 2008 with 100 shares of authorized capital stock.   Smith was the owner of the totality of the shares in CDS.   *Pl. Exh. No. 1.*

2.   Smith operated an automotive repair shop prior to starting CDS.   In that capacity, he came to know Kenneth Dwyer in 2004 when Smith purchased a lathe from Kenneth Dwyer's company, a tool and die business.   *Trial Tr. p. 240, ll. 7-13; p. 241, ll. 10-16.*

3.   At all times relevant to this action, Plaintiff was married to Kenneth Dwyer.   *Trial Tr. p. 13, ll. 11-18.*

4.   In 2013, Smith and Kenneth Dwyer agreed to enter into two business ventures together.   One was CDS in which Smith owned 51% of the stock and Kenneth Dwyer owned 49%.   *Trial Tr. p. 15, ll. 19-22.*   They also entered into a real estate purchasing venture wherein Smith and Kenneth Dwyer each owned 50% of the business. *Trial Tr. p. 15, ll. 10-12.*

5.    Smith and Kenneth Dwyer entered into an agreement entitled "Partnership Agreement" which was dated May 1, 2015 but was not executed until 2016, after Kenneth Dwyer was involved in a traffic accident. *Trial Tr. p. 246, l. 25, p. 247, l. 11.* Smith, Plaintiff, and Kenneth Dwyer discussed the agreement before executing it. Although Smith did not like certain clauses in the agreement and testified he told Plaintiff and Kenneth Dwyer that the Partnership Agreement "wasn't anything [they] had agreed upon", Smith executed it. *Trial Tr. p. 256, ll. 13-25, p. 257, ll. 1-9; p. 323, ll. 1-2.* Smith testified that he read the Partnership Agreement before he signed it. *Trial Tr. p. 286, ll. 12-14.* He then signed the Partnership Agreement because Plaintiff stated it would "make [Plaintiff] happy that she had something on paper because we had nothing on paper." *Trial Tr. p. 323, ll. 2-4.* Plaintiff testified she had nothing to do with the Partnership Agreement and that it was prepared by CDS' CPA, Jim Arthur located in Missouri. *Trial Tr. p. 17, ll. 1-15.*

6.    The Partnership Agreement designated the Partners in CDS to be Smith (51%) and Kenneth Dwyer (49%) and was governed by Oklahoma law by its terms. The purpose of the partnership was stated as "Machine Shop/Job Shop Manufacturing". The partnership was to begin on May 1, 2015 and "will continue until terminated as

provided in this Agreement." The Partnership Agreement stated that the capital contribution of the partners would be for "Calvin Smith – Cash and Labor - $510,000.00 USD" and for "Kenneth Dwyer – Cash and Equipment - $500,000.00 USD". *Pl. Exh. No. 2.*

7.   The Partnership Agreement was intended to also operate as the by-laws of CDS. *Trial Tr. p. 185, ll. 9-15.*

8.   Under the Partnership Agreement, Smith would act as the "Tax Matters Partner" who would "prepare, or cause to be prepared, all tax returns and reports for the Partnership and make any related elections that the Partners deem advisable." *Pl. Exh. No. 2, p. 6.*

9.   As the Tax Matters Partner, Smith signed the Federal Income Tax Returns for CDS for the tax years of 2016-2018.  The returns were prepared by an accountant from information provided by Smith. All of these returns reflected the ownership of CDS as Smith with 51% and Kenneth Dwyer with 49%.  *Pl. Exh. Nos. 8, 10, and 11.*

10.  The Partnership Agreement also provided for additional monetary contributions to the partnership.  In pertinent part, it provided:

> **Additional Capital**
>
> 9.  Capital Contributions may be amended from time to time, according to the requirements of the Partnership provided that the interests of the Partners are not affected, except with the

unanimous consent of the Partners. No Partner will be required to make Additional Capital Contributions. Whenever additional capital is determined to be required and an individual Partner is unwilling or unable to meet the additional contribution requirement within a reasonable period, as required by Partnership business obligations, remaining Partners may contribute in proportion to their existing Capital Contributions to resolve the amount in default, in such case the allocation of profits or losses among all the Partners will be adjusted to reflect the aggregate change in the Capital Contributions by the Partners.

10. Any advance of money to the Partnership by any Partner in excess of the amounts provided for in this Agreement or subsequently agreed to as Additional Capital Contribution will be deemed a debt due from the Partnership and not an increase in the Capital Contribution of the Partner. This liability will be repaid with interest at rates and times to be determined by a majority of the Partners within the limits of what is required or permitted in the Act. This liability will not entitle the lending Partner to any increased share of the Partnership's profits nor to a greater voting power. Such debts may have preference or priority over any other payments to Partners as may be determined by a majority of the Partners.

*Pl. Exh. No. 2, p. 3.*

11. Smith testified that "unanimous consent of the partners" as used in the Partnership Agreement meant "[w]hoever was the majority shareholder" decided the issue utilizing the term "unanimous consent". Later in his testimony at trial, Smith stated his position succinctly – "Unanimous is the majority shareholder".

5

*Trial Tr. p. 303, ll. 15-25, p. 304, ll. 1-21.* He also testified that "Majority was the rule. I was a 51 percent shareholder. I could overrule any decisions they made, yes." *Trial Tr. p. 286, ll. 20-21.*

12. Despite the existence of the executed Partnership Agreement, Smith believed that no partnership existed and that Kenneth Dwyer merely invested money to obtain a minority stake in the S corporation of CDS. *Trial Tr. p. 251, ll. 14-22.*

13. After Kenneth Dwyer's accident, Plaintiff came to the site of CDS' business to go through the paperwork. *Trial Tr. p. 247, ll. 20-22.* Plaintiff had not been involved with the paperwork of the business prior to Kenneth Dwyer's accident. *Trial Tr. p. 247, ll. 23-25.* Plaintiff became more involved with the business "because she had stayed out of until then, but she thought it would be better if she was involved and knew what was going on." *Trial Tr. p. 248, ll. 3-7.* Plaintiff explained that she was going to take over all of the bookkeeping and do all of the taxes and have her accounting firm, Hardy Associates, do all of the accounting for CDS. Smith had no problem with this because he could concentrate on production. *Trial Tr. p. 249, ll. 10-15.*

14. Plaintiff testified that after Kenneth Dwyer's accident and while he was staying with his daughter recovering from his

injuries, Smith asked to meet him at CDS' offices.   Plaintiff
stated she did so and Smith told her that CDS needed money to pay
payroll and to keep the business going.   He told her that the
business needed $26,000.00.   Plaintiff stated that she loaned CDS
$26,000.00 by check or money transfer with no promissory note and
only an oral loan agreement.   The money was paid back to her.
*Trial Tr. p. 18, ll. 20-25; p. 19, ll. 1-22.*

15.   Plaintiff stated that Smith asked her to help take care of
the record keeping for CDS.   Plaintiff testified that there was
no real record keeping for the business and that it needed to be
"straightened around".   Smith told her he would appreciate it if
she could help.   Plaintiff helped build files for outstanding
accounts and contracts.   *Trial Tr. p. 20, ll. 2-16.*

16.   CDS maintained an account at Valley National Bank.   The
business involved manufacturing parts pursuant to preferential
bidding on government contracts due to Smith's status as a Native
American and veteran.   The money for payment on the contracts were
directly deposited into the Valley National Bank account for the
years of 2015 and 2016.   *Trial Tr. p. 21, ll. 2-25; p. 22, ll. 1-15.*

17.   Smith told Plaintiff that he and Kenneth Dwyer were trying to
obtain a loan to operate CDS' business through Valley National

Bank but that the loan was going to cost $100,000.00.  Plaintiff told him that she could obtain the loan at a lower cost through her connections at Arvest Bank.  A loan of $972,000.00 was obtained at the lower cost from Arvest Bank.  CDS opened a bank account at Arvest Bank.  On August 20, 2016, Plaintiff was authorized to access the funds in the account and to write checks on the account. *Trial Tr. p. 23, ll. 10-21.*  Even after the Arvest Bank account was opened, the money from the government contracts paid to CDS continued to be deposited into the Valley National Bank account.  Smith, who was the only signatory to the Valley National Bank account, would transfer some of the money from that account to the account with Arvest Bank to cover expenses which Plaintiff identified needed to be paid after gathering information on the accounts payable. *Trial Tr. p. 25, ll. 11-25; p. 26, ll. 1-9.*

18.  Plaintiff next made a loan of $40,000.00 to CDS by check on July 28, 2016.  The check was drawn on Great Southern Bank and signed by Plaintiff.  In the "memo" line of the check, Plaintiff wrote "loan". *Pl. Exh. No. 22, p. 25.*  Plaintiff gave the check to Smith for materials for a project he was building and the money was deposited into the Valley National Bank account. *Trial Tr. p. 27, ll. 15-17; Pl. Exh. No. 22, p. 25.*  Smith told Plaintiff that the money would be repaid when the contract was paid thirty

days after the project was completed or about ninety days after
Plaintiff provided the money. *Trial Tr. p. 29, ll. 1-15.*
Plaintiff stated that the money was never repaid. *Trial Tr. p.
29, ll. 18-19.*

19. On July 20, 2016, Plaintiff wire transferred another
$10,000.00 to CDS into the Valley National Bank account. *Trial
Tr. p. 29, ll. 20-23; Pl. Exh. No. 22, p. 4.* The money was to be
used to pay CDS' payroll. *Trial Tr. p. 29, ll. 24-25.* Plaintiff
considered the payment to be a loan to CDS. She stated that Smith
told her she would be repaid when the money came into the company.
While she believes the money came in on the contracts, she has not
been repaid the amount loaned. She testified that she relied upon
Smith's statements in loaning the money to CDS. *Trial Tr. p. 30,
ll. 1-14.*

20. On August 17, 2016, Plaintiff wire transferred $15,000.00 to
the Valley National Bank account for the payment of CDS' payroll
and possibly payment of bills. *Trial Tr. p. 30, ll. 15-20.*
Plaintiff considered the payment another loan to CDS and Smith
told her that she would be repaid when contracts were paid and
Plaintiff relied upon the statement to make the loan. *Trial Tr.
p. 30, ll. 21-25.* She expected to be repaid within ninety days
based upon Smith's representations but the money was never repaid.

9

*Trial Tr. p. 31, ll. 1-15.*

21. On January 16, 2017, Plaintiff deposited an additional $10,000.00 into the Arvest Bank account for payment of CDS' payroll as a loan. *Trial Tr. p. 31, ll. 16-24; Pl. Exh. No. 22, p. 6.* Smith asked Plaintiff to loan CDS the money. She expected repayment within ninety days from money received on government contracts but the money was never repaid. *Trial Tr. p. 32, ll. 1-11.*

22. On March 29, 2017, Plaintiff wrote a check to CDS in the amount of $6,000.00 for payroll at Smith's request. The money was deposited into CDS' Arvest Bank account. Plaintiff loaned the money to CDS based upon accounts receivable information showing when contracts were to be repaid which was given to Arvest Bank loan officer Ray Tubaugh. *Trial Tr. p. 33, ll. 1-25, p. 34, ll. 1-7; Pl. Exh. No. 22, p. 7.*

23. On April 5, 2017, Plaintiff paid $1,000.00 cash into the CDS Arvest Bank account from cash paid on her rental properties. Plaintiff paid the amount for a bill owed by CDS. Smith represented that the amount would be repaid but it was not. *Trial Tr. p. 36, ll. 5-22, p. 37, ll. 1-14; Pl. Exh. No. 22, p. 9.*

24. On April 5, 2017, Plaintiff wrote a check to CDS in the amount of $15,000.00 and deposited it into the CDS Arvest Bank account

for paying CDS' bills and payroll at Smith's request. She considered the payment a loan to the company that would be repaid based upon Smith's representations. Plaintiff was not repaid this amount. *Trial Tr. p. 37, ll. 15-25, p. 38, ll. 1-14; Pl. Exh. No. 22, p. 10.*

25. On April 6, 2017, Plaintiff deposited $1,000.00 in cash for into CDS' bank account as a loan. Plaintiff was not repaid for this amount. *Trial Tr. p. 38, ll. 15-23; Pl. Exh. No. 22, p. 11.*

26. On April 6, 2017, Plaintiff deposited $3,920.00 into CDS' Arvest Bank account for use on payroll at Smith's request. Plaintiff was told by Smith that the amount would be repaid upon which Plaintiff relied in making the loan. The amount was never repaid. *Trial Tr. p. 38, ll. 24-25, p. 39, ll. 1-12; Pl. Exh. No. 22, p. 12.*

27. On April 26, 2016, Smith and Kenneth Dwyer borrowed $972,000.00 from Arvest Bank secured by a mortgage on the joint venture real property they had purchased as tenants in common in 2014. *Pl. Exh. Nos. 4 and 7.* The real estate was the subject of a Joint Venture Agreement between Smith and Kenneth Dwyer wherein each contributed $500,000.00 in cash and equipment. *Pl. Exh. No. 5.* The real property was then leased by CDS under a written Lease Agreement. *Pl. Exh. No. 6.* CDS would make payments on the note

with Arvest Bank as the monthly base rent. *Trial Tr. p. 146, ll. 21-25, p. 147, ll. 1-7.*

28.  Proceeds from the $972,000.00 loan were paid as follows:

- Plaintiff - $26,000.00 to repay the original loan to CDS.

- Smith's Father-in-Law - $25,000.00 to repay a loan to CDS.

- Smith's Wife - $25,000.00 to repay a loan to CDS.

- Kenneth Dwyer - $25,000.00 to repay a loan to CDS.

- Valley National Bank - $350,000.00 to repay a loan to CDS.

- Southwest Missouri Bank - $490,000.00 to repay a loan to Kenneth Dwyer which was used to construct a new building leased by Smith and Kenneth Dwyer to CDS.[2]

- Operating capital for CDS.

  *Trial Tr. p. 112, ll. 10-13; p. 312, ll. 3-13; p. 160, ll. 6-25, p. 161, ll. 1-4.*

29.  Between November 7, 2016 and May 10, 2017, Plaintiff purchased items for use by CDS in the business including $3,981.95 for payroll on April 5, 2017.  Plaintiff considered this a bill like any other to be repaid by CDS. *Trial Tr. p. 39, ll. 13-25, p. 40,*

---

2 Smith and CDS have contended that Kenneth Dwyer's initial capital investment into the CDS venture to build the building used by the company was represented in this $490,000.00 loan from Southwest Missouri Bank which CDS eventually repaid.  While this may be the case, this circumstance is of little moment on the question of whether Plaintiff provided funds as loans from her own businesses and her own separate bank accounts over which she had control.

*ll. 1-16; Pl. Exh. No. 22, p. 13-16.*

30.  On April 12, 2017, Plaintiff deposited $3,000.00 in cash and wrote a check in the amount of $9,000.00 to CDS and deposited the money into the CDS Arvest Bank account.  Plaintiff loaned the money to CDS to keep it afloat with the promise of repayment. *Trial Tr. p. 40, ll. 17-25, p. 41, ll. 1-16.*

31.  On April 18, 2017, Plaintiff wrote a check to CDS in the amount of $5,000.00 and deposited it into the CDS Arvest Bank account.  The money was loaned to CDS at Smith's request to make payroll.  Plaintiff was told by Smith that the money would be repaid after the government contracts were paid.  This loan has not been repaid except for a few checks which will be noted. *Trial Tr. p. 41, ll. 21-25, p. 42, ll. 1-11; Pl. Exh. No. 22, p. 18.*

32.  On April 26, 2017, Plaintiff deposited $2,000.00 in cash and $3,000.00 in checks into CDS' Arvest Bank account.  The amount was provided for payroll and bills for the benefit of CDS. *Trial Tr. p. 42, ll. 14-19; Pl. Exh. No. 22, p. 19.*

33.  On May 3, 2017, Plaintiff wrote and deposited a check in the amount of $5,000.00 into the CDS Arvest Bank account.  She loaned the money for CDS' payroll and bills and to "keep the company floating."  Smith told Plaintiff that the loan would be repaid "[w]hen money got into the company." *Trial Tr. p. 42, ll. 20-25,*

13

*p. 43, ll. 1-9; Pl. Exh. No. 22, p. 20.*

34.   On May 9, 2017, Plaintiff deposited $110,000.00 into the CDS Arvest Bank account.   Of that amount, $100,000.00 went to Arvest Bank because CDS could not make its loan payment to the bank.   The check written by Plaintiff came from her money market account and indicated in the memo section of the check that it is for "loan". *Pl. Exh. No. 22, p. 21*.   Arvest Bank had provided CDS with a six month single pay line of credit of $100,000.00.   Plaintiff and Smith were e-mailed by Ray Tubaugh with Arvest Bank concerning the repayment of the line of credit which Smith immediately forwarded to Plaintiff.   Plaintiff requested a six month extension on the repayment of the line of credit but Tubaugh would not grant the request because he had been assured the line of credit would create money.   Plaintiff had nothing to do with the line of credit so these representations were made by either Smith or Kenneth Dwyer or both.   Plaintiff suggested Smith get the money from his father-in-law.   Smith told Plaintiff he needed help getting the money or the business would be foreclosed upon and his father-in-law would not loan him the money.   Smith then asked Plaintiff to loan him the money resulting in the $100,000.00 payment from Plaintiff.   He called Plaintiff eight times in four hours on the date that Plaintiff deposited the money into the CDS Arvest Bank account,

evidencing his request for the loan.  The remaining $10,000.00 was represented in a check Plaintiff deposited in CDS' Arvest Bank account.  The check notes the payment was a "loan" in the memo section.  This amount went to pay CDS' bills.  *Trial Tr. p. 43, ll. 15-25, p. 44-48, p. 49, ll. 1-22; Pl. Exh. No. 16; 17; and 22, p. 21-22.*  Plaintiff was told by Smith she would be repaid from the proceeds derived from the payment on contracts.  *Trial Tr. p. 48, ll. 17-19.*

35.  On May 16, 2017, Plaintiff wrote a check to CDS for $2,500.00.[3]

36.  Plaintiff testified at trial that, in addition to the repayment of the first loan of $26,000.00, she has received payments from CDS in the amount a total of $16,000.00.  *Trial Tr. p. 32, ll. 13-15.*

37.  The evidence provided by Defendants demonstrates that Plaintiff received direct payment from CDS on September 6, 2016 in

---

[3] Plaintiff provides a chart in her Proposed Findings of Fact and Conclusions of Law setting forth the payments made by her outside of the $26,000.00 amount that was repaid.  The chart, however, does not coincide with the references in the testimony or in the exhibits.  The chart includes a payment made on May 16, 2017 in the amount of $9,000.00, referencing Pl. Exh. No. 22, p. 2.  However, that exhibit references a payment of $9,000.00 made on April 13, 2017 – an amount encompassed by the $12,000.00 entry reflected in Pl. Exh. No. 22, p. 17.

Additionally, a payment made on April 5, 2017 in the amount of $15,000.00 found at Pl. Exh. No. 22, p. 10 is not included in the chart nor is a payment made on April 26, 2017 in the amount of $5,000.00 found at Pl. Exh. No. 22, p. 19.  Also omitted is the payment Plaintiff made for goods provided to CDS in the amount of $3,981.95 calculated at Pl. Exh. No. 22, p. 13-16.  The inclusion and omission of these various items results in a total payment by Plaintiff to CDS in the amount of $227,401.95 after the deduction of the $16,000.00 in total payments received by Plaintiff from CDS by her own admission.

the amount of $1,415.00 and October 24, 2016 in the amount of $10,000.00.  A further withdrawal from the CDS Arvest Bank account was signed by Plaintiff on September 7, 2016 in the amount of $7,273.14 but it is unclear from the evidence whether Plaintiff received this money or whether the withdrawal was used for a CDS business purpose.  *Def. Exh. No. 8, p. 10, 19.*

38.  In May of 2017, Plaintiff presented Smith with a promissory note in the amount of $251,000.00 obligating CDS to repay the loans made by Plaintiff and her companies.  The note was already signed by Kenneth Dwyer but Smith refused to sign.  *Pl. Exh. No. 26; Trial Tr. p. 126, ll. 7-25, p. 127, ll. 1-13.*

39.  Smith then closed CDS' Arvest Bank account and opened a new account with regard to which only Smith had authority to access the account.  Kenneth Dwyer did not authorize the creation of the account as required by the Partnership Agreement.  *Trial Tr. p. 56, ll. 7-12, p. 232, ll. 1-9, p. 233, ll. 1-5.*

<u>**CONCLUSIONS OF LAW**</u>

A.  This Court possesses the appropriate jurisdiction over the parties and subject matter of this action, which is based in diversity jurisdiction.  18 U.S.C. § 1332(a)(1).  Further, venue is proper in this District.  28 U.S.C. § 1391(b).

B.  Any finding of fact which is more appropriately described

16

as a conclusion of law shall stand as such. Similarly, any conclusion of law which might be considered as a finding of fact will be so deemed.

C.  As reflected at trial, Plaintiff asserts three bases for relief in this action B (1) collection on defaulted obligations represented in the various loans provided by Plaintiff to CDS; (2) fraud by Smith in procuring the loans by making material misrepresentations that the loans would be repaid from proceeds obtained on the contracts CDS had with governmental entities; and (3) unjust enrichment of CDS by the loans made to it by Plaintiff.

D.  Plaintiff's first claim is only actionable if the proceeds provided by her to CDS are loans such that they form recoverable obligation.  Smith contends that the amounts provided by Plaintiff constituted capital contributions by Kenneth Dwyer which are not entitled to repayment.  Several material facts belie Smith's interpretation of the transactions between CDS and Plaintiff.  First and foremost, Smith ignores the fact that Plaintiff and her companies which provided the funds to CDS are not Kenneth Dwyer nor a party to the Partnership Agreement, which were also considered the Bylaws of CDS.  Smith's attempt to transform Plaintiff's act of providing loaned funds to CDS into a further or additional capital contribution by her husband ignores

17

the separation between these parties – one acting as a partner to Smith and the other as an outsider to the business relationship loaning money to keep the business afloat.   Moreover, much as Smith might prefer that the Partnership Agreement did not exist or had no effect upon the relationship between he and Kenneth Dwyer, the Partnership Agreement represents a valid if not an altogether masterfully drafted legal agreement.   As such, the terms of the Partnership Agreement must be enforced to the extent possible.

Under Oklahoma law, "the paramount objective of contract interpretation is to ascertain and give effect to the intention of the parties. *See* Murphy v. Earp, 382 P.2d 731, 733 (Okla. 1963). The parties' intent must be discerned from the language of the contract 'if the language is clear and explicit[ ] and does not involve an absurdity.'   Okla. Stat. tit. 15, § 154."   The Court is required to "look to the entirety of the agreement and construe 'every provision . . . so as to be consistent with each other' and adopt the construction that, 'if possible, gives effect to every part of the contract.' Sullivan v. Gray, 182 Okla. 487, 78 P.2d 688, 690 (1938); *see also* Okla. Stat. tit. 15, § 157 ('The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others.')." Husky Ventures, Inc. v. B55 Investment,

Ltd., 911 F.3d 1000, 1015 (10th Cir. 2018).

In this case, the Partnership Agreement/By Laws of CDS expressly provides that the capital contribution of the partners may only be amended with the "unanimous consent of the partners." While Smith maintains a tortured and blatantly erroneous definition of "unanimous consent" to mean "autonomous consent" by him alone as majority interest holder in the partnership and majority shareholder in CDS, clearly the capital contribution of the partners could not be affected by additional payment of monies.

Additionally, paragraph 10 of the Partnership Agreement explicitly provides any further advance of money to CDS constitutes a "debt due from the Partnership and not an increase in Capital Contribution of the Partner." Thus, even if somehow Plaintiff's payments to CDS were considered an act of her husband, characterizing and interpreting the payments as additional capital contributions is strictly prohibited by the Partnership Agreement.

Further, at least three of the payments were expressly noted by Plaintiff to be loans to CDS – a fact which should have been apparent to Smith. This clearly reflects the intent of the loaner contemporaneously with the making of the loan.

The handling of Plaintiff's first payment of $26,000.00 also demonstrates the overall intent of the parties. This loan was

repaid by CDS.  This repayment established the course of conduct between Plaintiff and CDS in all future similar transactions. "Oklahoma law clearly provides that the parties' prior dealings may be used to establish the extent of their agreement in the form of an implied contract." Advantage Polymers, Inc. v. Kimberley Mfg. Co., 2010 WL 356456, at *1 (W.D. Okla. Jan. 26, 2010) citing Simpson Properties, Inc. v. Oexco, Inc., 916 P.2d 853, 856 (Okla. Ct. Civ. App. 1996).  Implied contracts are recognized in Oklahoma. "A contract implied in fact, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract." Ray F. Fischer Co. v. Loeffler-Green Supply Co., 289 P.2d 139, 141 (Okla. 1955).

Clearly, the beginning of the lending relationship between Plaintiff and CDS through Smith established the relationship in the future in the form of an implied contract.  If Smith or CDS considered the payment to be a capital contribution, it is only reasonable to presume that each payment would be addressed similarly; that is, the $26,000.00 would not have been repaid if

it were not a loan.  Subsequent payments should be consistently considered the same.

Additionally, the overall course of conduct between Plaintiff and Smith lends itself to an interpretation that the payments made were, indeed, considered loans subject to repayment.  The evidence of constant contact between Plaintiff and Smith in particular when the line of credit with Arvest Bank was due and owing indicates that Smith relied upon Plaintiff for funding CDS' projects and to keep its business operations functioning.  It is contrary to reason to believe Plaintiff made these substantial and repeated payments without an assurance of repayment from the proceeds of CDS' government contracts.  Because of these facts, this Court concludes that the payments made by Plaintiff constituted loans to CDS.

The evidence indicates that CDS remains in default on the loans.  While the evidence indicates that Plaintiff is entitled to judgment on the defaulted amount of $223,420.00 on the outstanding loans to CDS, Plaintiff has limited her recovery by seeking $198,920.00 and will receive this award.  See, *Pretrial Order, Docket Entry #31, p. 1.*[4]  Plaintiff has also claimed

---

[4] Plaintiff testified that she was seeking $197,920.00 at trial.  *Trial Tr. p. 55, ll. 11-13.*  However, this is the only instance in the evidence where this different amount was claimed.  The Court will rely upon the representations made in the Pretrial Order to ascertain the amount sought.

recovery of $3,981.95 in goods provided to CDS but the testimony at trial reveals she did not believe this was a loan to CDS but an amount due like any other vendor bill.[5]

E.  Plaintiff's second claim against Smith for fraud requires a showing that Smith (1) made a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage.  Bowman v. Presley, 212 P.3d 1210, 1218 (Okla. 2009).  Although fraud is never presumed, but must be proved, it may be proved by circumstantial evidence.  Silk v. Phillips Petroleum Co., 760 P.2d 174, 177 (Okla. 1988) citing Austin v. Wilkerson, Inc., 519 P.2d 899 (Okla. 1974).

Smith repeatedly misrepresented that Plaintiff would be repaid from contract proceeds received by CDS.  The Court draws the conclusion that the statements were both material and misrepresentations from the fact that Plaintiff was never repaid after the first loan even after CDS received funds on the contracts and that Smith now contends the receipt of monies from Plaintiff were not loans at all in spite of his promises of repayment in

---

5 While a discrepancy exists in the evidence as to precisely how much CDS repaid to directly to Plaintiff in 2016 and 2017 (either $16,000.00 according to Plaintiff or as high as $18,688.14 according to CDS' banking records), the amount deducted from the loans provided by Plaintiff would still be less than the judgment amount sought by Plaintiff of $197,920.00.

order to procure the loans.

Because Smith continued to repeatedly approach Plaintiff for the infusion of money into CDS while not utilizing the receivables from the government contracts to even attempt to repay the loans after the initial $26,000.00 (which was actually paid from the loan proceeds obtained from Arvest Bank), this Court must conclude that Smith knew the statements of repayment to be false each time they were made in an effort to procure the money from Plaintiff.

Smith also made the representations with the intent that Plaintiff would rely upon them to make the loans to CDS.  CDS needed cash to be infused into the business operation, Plaintiff had loaned money before based upon Smith's assurances of repayment, and he continued to make the same misrepresentation upon which Plaintiff would rely to loan the money.

Plaintiff continued to repeatedly rely upon Smith's misrepresentations that the money would be repaid to provide additional loans to CDS.  The result was over $200,000.00 in unpaid loans to CDS to Plaintiff's detriment.  Based upon Plaintiff's testimony which this Court finds to be most credible and the circumstances surrounding the transactions, Plaintiff has demonstrated that Smith engaged in fraud to procure her loans to CDS.

F.   The third and final claim asserted by Plaintiff claims that CDS was unjustly enriched by her loans.   Plaintiff states that she presents this claim as an alternative theory to the collection on the loans.   See, *Plaintiff's Proposed Findings of Fact and Conclusions of Law (Docket Entry #38), p. 15.*   Since this Court has found that Plaintiff is entitled to judgment on the collection of the loans provided to CDS, the alternative claim of unjust enrichment need not be determined.

G.   Plaintiff also contends she is entitled to interest on the outstanding balance due from CDS and Smith.   Since an express contract between the parties does not exist to establish a different rate of interest, the judgment will be subject to the statutory interest rate of 6% per annum.   Okla. Stat. tit. 15 § 266.

H.   Plaintiff includes a request for attorney's fees in her relief sought.   Any claim by Plaintiff to an entitlement to reimbursement for attorney's fees shall be addressed by separate motion.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the Plaintiff, Christine Dwyer, and against the Defendants, CD's Machine, Inc. and Calvin Smith in the total amount of $198,920.00 plus interest accruing at a rate of 6% per

annum.

A separate judgment shall issue forthwith.

IT IS SO ORDERED this 18th day of August, 2020.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE